# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 24, 2013    Decided April 18, 2014

No. 10-1371

NATURAL RESOURCES DEFENSE COUNCIL,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY AND GINA
MCCARTHY, IN HER OFFICIAL CAPACITY AS ADMINISTRATOR,
U.S. ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

CEMEX, INC., ET AL.,
INTERVENORS

———

Consolidated with 10-1378, 13-1112

———

On Petitions for Review of Final Actions of the
United States Environmental Protection Agency

———

*James S. Pew* and *Seth L. Johnson* argued the causes for petitioners. With them on the briefs were *John Walke*, *Meleah Geertsma*, and *Avinash Kar*.

*Matthew R. Oakes*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were

*Robert G. Dreher*, Acting Assistant Attorney General, and *Steven E. Silverman*, Attorney, U.S. Environmental Protection Agency. *Daniel R. Dertke* and *T. Monique Peoples*, Attorneys, U.S. Department of Justice, entered appearances.

*Carter G. Phillips* argued the cause for intervenors. With him on the briefs were *Roger R. Martella Jr.*, *Timothy K. Webster*, *Ryan C. Morris*, *William M. Bumpers*, *Debra J. Jezouit*, *Michael B. Schon*, *Deborah E. Jennings*, *Chet M. Thompson*, *Beth S. Ginsberg*, *Jason T. Morgan*, *Ashley C. Parrish*, *Cynthia A.M. Stroman*, and *Richard G. Stoll*.

*Russell S. Frye* and *Richard G. Stoll* were on the brief for *amici curiae* SSM Coalition, et al. in support of respondents.

Before: KAVANAUGH and SRINIVASAN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: Portland cement is the key ingredient in concrete. The basic process for making Portland cement is much the same today as it was when the material was first developed nearly 200 years ago. Cement manufacturers pulverize limestone and minerals, and then heat those raw materials to several thousand degrees. The resulting substance, called clinker, is then cooled and ground into a fine gray powder. This powder – called Portland cement – is later combined with sand, rocks, and water to make concrete.

The grinding and heating involved in cement manufacturing has an unfortunate side effect: It releases into the air a number of hazardous air pollutants, most notably

mercury, hydrochloric acid, hydrocarbons, and particulate matter. This case concerns EPA's efforts to develop rules under the Clean Air Act to limit emissions of those pollutants from cement plants.

In a previous decision, we considered EPA's first attempt to create emission standards for the cement industry, and we found the agency's action arbitrary and capricious. *See Portland Cement Association v. EPA*, 665 F.3d 177 (D.C. Cir. 2011). Following our ruling, EPA went back to the drawing board and developed the emission standards at issue here, the 2013 Rule.

Several environmental organizations, including the Natural Resources Defense Council and the Sierra Club, have petitioned for review of the 2013 Rule, arguing primarily that certain aspects of the Rule contravene the Clean Air Act. They also challenge EPA's decision to create an affirmative defense for private civil suits in which plaintiffs sue sources of pollution and seek penalties for violations of emission standards. EPA's affirmative defense would be available to defendants in cases where an "unavoidable" malfunction had resulted in impermissible levels of emissions.

We conclude that the emissions-related provisions of EPA's 2013 Rule are permissible but that the affirmative defense for private civil suits exceeds EPA's statutory authority. We therefore grant the petitions in part and vacate the portion of the Rule pertaining to the affirmative defense. We deny the petitions in all other respects.

I

Section 112 of the Clean Air Act, 42 U.S.C. § 7412, requires EPA to establish technology-based emission standards for major sources of certain hazardous air

4

pollutants. Emission standards must reflect "the maximum degree of reduction in emissions" that EPA determines is "achievable," taking into consideration "the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements." 42 U.S.C. § 7412(d)(2). The resulting standards are commonly known as the "maximum achievable control technology," or "MACT" standards. *See National Lime Association v. EPA*, 233 F.3d 625, 630 (D.C. Cir. 2000).

EPA uses a two-step process for establishing MACT standards. The agency begins by setting a minimum stringency level, or "floor," based on the results achieved by the best-performing similar sources. *See* 42 U.S.C. § 7412(d)(3). Once EPA sets the statutory floor, it then determines, considering cost and the other factors listed in Section 112(d)(2), whether a more restrictive standard is "achievable," and if so then adopts that standard. EPA calls these stricter requirements "beyond-the-floor" standards. *Sierra Club v. EPA*, 479 F.3d 875, 877 (D.C. Cir. 2007).

When EPA sets an emission standard, it also determines a schedule for compliance with that standard. For existing sources, EPA must "provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date" of the emission standard. 42 U.S.C. § 7412(i)(3)(A).

In 2010, pursuant to its Section 112 authority, EPA promulgated National Emission Standards for Hazardous Air Pollutants from the Portland Cement Manufacturing Industry and Standards of Performance for Portland Cement Plants, 75 Fed. Reg. 54,970 (Sept. 9, 2010). That 2010 Rule set or revised emissions limits for mercury, hydrogen chloride, total hydrocarbons (a surrogate for organic hazardous air pollutants

such as benzene and formaldehyde), and particulate matter (a surrogate for certain non-mercury metals).  Cement plants would be required to comply with the new standards beginning in September 2013.  75 Fed. Reg. at 54,993.

In addition to establishing emission standards, the 2010 Rule created an affirmative defense in private civil suits when violations of the standards occurred because of "unavoidable" malfunctions.  *See id.* at 54,993, 55,053.  The affirmative defense replaced a previous EPA policy creating an exemption from emissions limitations during malfunction events.  In a prior decision, this Court struck down that exemption because it was inconsistent with the requirement that emission standards apply continuously.  *See Sierra Club v. EPA*, 551 F.3d 1019, 1027-28 (D.C. Cir. 2008).

Industry groups petitioned this Court for review and we found the 2010 Rule arbitrary and capricious and remanded to EPA.  We ruled specifically that, in calculating the floor for MACT purposes, EPA had arbitrarily included in its dataset information from cement kilns properly classified as commercial incinerators, which are regulated under a separate provision of the Act.  *See Portland Cement Association v. EPA*, 665 F.3d 177, 186-89 (D.C. Cir. 2011).

In our 2011 decision, however, we did not vacate the emission standards set forth in the 2010 Rule or stay its implementation pending EPA's reconsideration process, stating that "it is unlikely that significant changes will be made to the standards upon reconsideration."  *Id.* at 189.

On remand, however, EPA made several relevant changes to the Portland cement emission standards.  *See* National Emission Standards for Hazardous Air Pollutants for the Portland Cement Manufacturing Industry and Standards of

Performance for Portland Cement Plants, 78 Fed. Reg. 10,006 (Feb. 12, 2013) (the 2013 Rule).

*First*, consistent with our *Portland Cement* opinion, EPA revised its dataset to exclude commercial incinerators. When recalculated using the revised data, the maximum emissions level for particulate matter – the floor – was ultimately revised from 0.04 lb/ton to 0.07 lb/ton of clinker for existing kilns. *See id.* at 10,017-19. And EPA declined to re-adopt the more stringent, 0.04 lb/ton limit of the 2010 Rule as a beyond-the-floor standard. The agency reasoned that achieving that additional increment of particulate reduction would not be cost effective on a cost-per-ton basis. *See id.* at 10,020-21.

*Second*, citing additional compliance strategies afforded cement manufacturers by the revised particulate standard, EPA established a new compliance date of September 2015 for that standard. *See id.* at 10,014. EPA further concluded that although the emissions limits for mercury, hydrochloric acid, and hydrocarbons remained the same as in the 2010 Rule, the new September 2015 compliance date would also apply to those emission standards. According to EPA, coordinating the compliance date for particulate matter, mercury, hydrochloric acid, and hydrocarbons was essential because the latter standards "all typically involve some element of [particulate matter] generation and capture and so the controls must be integrated with [particulate matter] control strategies." *Id.* at 10,022.

The 2013 Rule also retained the affirmative defense for private civil suits when the defendant violated emission standards due to an unavoidable malfunction. EPA explained that in its view, the affirmative defense was necessary to resolve a "tension" between the Clean Air Act's requirement

that emission standards apply at all times and the fact that emission limits may sometimes be exceeded for reasons beyond the control of the source. *See id.* at 10,014.

NRDC, the Sierra Club, and other environmental organizations have petitioned for review of various aspects of the 2013 Rule. In Part II of this opinion, we address petitioners' arguments regarding the emission standards for particulate matter. In Part III, we address petitioners' challenge to the compliance schedule implementing some of the 2013 Rule's emission standards. In Part IV, we consider whether EPA's decision to create the affirmative defense to civil penalties for certain malfunction-related events exceeds the agency's statutory authority.

## II

We first consider petitioners' challenges to the emission standards for particulate matter.

## A

The 2013 Rule ultimately set the emissions level for particulate matter at 0.07 lb/ton of clinker for existing kilns. The 2010 Rule had set the level at 0.04 lb/ton of clinker. Petitioners argue that the 2013 Rule weakens the particulate matter standard in violation of Section 112(d)(7) of the Clean Air Act, 42 U.S.C. § 7412(d)(7). That provision, titled "Other requirements preserved," states:

> No emission standard or other requirement promulgated under this section shall be interpreted, construed or applied *to diminish or replace the requirements of a more stringent emission limitation* or other applicable requirement established pursuant to

section 7411 of this title, part C or D of this subchapter, *or other authority* of this chapter or a standard issued under State authority.

(emphases added).  Petitioners maintain that EPA violated Section 112(d)(7) because the 2013 Rule's particulate matter standards "diminish or replace" the more stringent standards in the 2010 Rule.

EPA responds that such a reduction does not violate Section 112(d)(7).  In EPA's view, the most natural reading of Section 112(d)(7) is that "other authority" refers to authority other than Section 112 and other than the parts of the Clean Air Act specifically enumerated in Section 112(d)(7).  Stated another way, EPA suggests that Section 112(d)(7) is simply a savings clause that makes clear that Section 112 does not supersede the requirements of other, more restrictive provisions of the Act.

By contrast, petitioners say that "other authority" of the Act includes Section 112 itself, as well as other provisions in the Act.  Petitioners read the statute as an anti-backsliding restriction on EPA's ability to voluntarily reduce the stringency of any emission standard issued under Section 112.

As EPA points out, however, when Congress has sought to include that sort of anti-backsliding provision in the Clean Air Act, it has done so directly and explicitly.  *Cf., e.g.*, 42 U.S.C. § 7410(*l*) ("The Administrator shall not approve a revision of a [State Implementation Plan] if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress"); *id.* § 7502(e) (specifying pollution control requirements if "the Administrator relaxes a national primary ambient air quality standard").  Section 112(d)(7) contains no such language.  Furthermore, EPA argues that petitioners' interpretation of

Section 112(d)(7) would mean that any change to a rule issued under Section 112 – even a necessary change made just for technical reasons or because there was a calculation error – would be impermissible if the change made the standard less stringent. EPA says that it would be extraordinary if the statute precluded that kind of necessary change.

In wading through this back-and-forth, we ultimately need not decide whether EPA's reading is the better or only reading of this statutory provision, but simply whether it is a permissible reading. EPA administers the Clean Air Act, and we must defer to its reasonable interpretation of any ambiguities in the statute. *See Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843-44 (1984). Here, even if the statute does not compel EPA's reading, and indeed even if EPA's reading is not the better reading, the statute at a minimum is sufficiently ambiguous on this point to permit EPA's reading of "other authority." Because EPA's reading is at least reasonable, we reject petitioners' argument and rule for EPA at *Chevron* step two.

B

Petitioners also contend that EPA should have set a more restrictive particulate matter standard when considering whether to set "beyond-the-floor" standards. Petitioners argue in particular that EPA misinterpreted the statute to allow it to consider cost-effectiveness when setting beyond-the-floor standards.

Under Section 112(d), EPA must require "the maximum degree of reduction in emissions" that EPA determines is "achievable." 42 U.S.C. § 7412(d)(2). To determine that emission level, EPA first establishes a minimum stringency level, or "floor," based on the emission results achieved by

the best-performing sources in the category at issue. *See id.* § 7412(d)(3). Once EPA sets the statutory floor, it then determines, based on cost and the other factors listed in Section 112(d)(2), whether a more restrictive, beyond-the-floor standard is achievable.[1]

When it promulgated the 2013 Rule, EPA rejected petitioners' argument to set a 0.04 lb/ton limit as a beyond-the-floor standard. 78 Fed. Reg. at 10,020. EPA estimated that a beyond-the-floor standard set at the 0.04 lb/ton level would result in a reduction of 138 tons of particulate matter per year, at a cost of $37 million. *Id.* Based on those estimates, EPA noted that the cost-effectiveness of the potential beyond-the-floor standard – $268,000 per ton of particulate matter removed – was substantially lower than the cost-effectiveness of other emission standards previously rejected by EPA. *See* 78 Fed. Reg. at 10,021.

Petitioners take issue with EPA's consideration of cost-effectiveness as a component of the Section 112(d)(2) cost analysis. Petitioners contend that "cost" for purposes of the statute only concerns whether "the standard is too expensive for industry to achieve," in essence, whether the standards would bankrupt the industry. Pet'rs Br. 34.

---

[1] In relevant part, the statute reads: "Emissions standards promulgated under this subsection and applicable to new or existing sources of hazardous air pollutants shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, *taking into consideration the cost of achieving such emission reduction*, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory . . . ." 42 U.S.C. § 7412(d)(2) (emphasis added).

EPA says that Congress afforded it wide latitude in deciding how to balance cost and other considerations when determining that maximum achievable reduction in emissions. According to EPA, Section 112 does not command EPA to use a particular form of cost analysis. In taking cost into account, EPA contends that it may determine whether the proposed emission levels would be cost-effective. Indeed, EPA notes that this Court has previously recognized EPA's authority to consider cost-effectiveness in setting standards under nearly identical provisions of the Clean Air Act. *See, e.g.*, *Husqvarna AB v. EPA*, 254 F.3d 195, 200 (D.C. Cir. 2001) ("Because section 213 does not mandate a specific method of cost analysis, we find reasonable the EPA's choice to consider costs on the per ton of emissions removed basis."); *National Association of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1156-57 (D.C. Cir. 2013) (citing *Husqvarna*; EPA could consider cost-effectiveness in setting a beyond-the-floor standard under Section 129(a)(2) of the Act).

Again on this issue as with the first, we need not decide whether EPA's reading is the only reading of this provision. Even if the statute does not compel EPA's approach, and even if EPA's reading is not the better reading, we conclude that it is still at least a reasonable reading given the various potential meanings of "cost" in this context. Therefore, we reject petitioners' argument that EPA was required to exclude consideration of cost-effectiveness and to set a beyond-the-floor standard of 0.04 lb/ton of clinker.

III

Next, we consider petitioners' claim that EPA acted unreasonably in setting a compliance date of September 2015

for the emission standards for particulate matter, mercury, hydrochloric acid, and hydrocarbons.

Under Section 112(i)(3)(A) of the Clean Air Act, EPA must require compliance with emission standards for existing sources "as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard." 42 U.S.C. § 7412(i)(3)(A). Petitioners here contend that EPA violated this timing provision by "extending" the compliance deadline for the 2010 Rule from September 2013 to September 2015.

As applied to the particulate matter standard, there is a basic flaw in petitioners' argument: The 2013 Rule did not simply "extend" the deadline for complying with the 2010 Rule. Rather, the 2013 Rule established new particulate matter standards with a new effective date of February 2013, and a new compliance date of September 2015. EPA concluded that any earlier date of compliance would not be practicable because of the multi-year timeline for upgrading the technology necessary to ensure compliance. *See* 78 Fed. Reg. at 10,024. As we have ruled before, EPA may reset the compliance date for an emission standard when it introduces a new standard with a new effective date, as was the case for particulate matter in the 2013 Rule. *See NRDC v. EPA*, 489 F.3d 1364 (D.C. Cir. 2007).

According to petitioners, even if EPA could change the compliance date for the particulate matter standard, the agency could not do the same for the mercury, hydrochloric acid, and hydrocarbon standards. The 2010 Rule set the emission levels for those pollutants, and the 2013 Rule did not alter the emission levels for those pollutants. This situation does indeed present a bit of a conundrum. On the one hand, we know under the terms of the statute that EPA has set a

compliance date of 2015 as the date that is as expeditious as practicable for particulate matter. On the other hand, our prior decision did not vacate the prior 2010 Rule, and the compliance date for the other pollutants as set forth in that Rule would otherwise be 2013.

This conundrum is resolved when one realizes that it would be irrational and even absurd to have different compliance dates for the different pollutants. EPA explained that the technology is such that it would be senseless to have different compliance dates. *See* 78 Fed. Reg. at 10,024. Even petitioners do not deny that the compliance date for all the pollutants should be the same. To be sure, they want 2013 not 2015 as the compliance date. But they recognize the general undesirability of a compliance date of 2013 for some of the pollutants and of 2015 for other pollutants. *See* Tr. of Oral Argument at 10-11. Finally and perhaps most importantly, our prior decision in this case also recognized, at least implicitly, that there must be a single compliance date for all of the pollutants. *See Portland Cement Association*, 665 F.3d at 189. Our decision necessarily relied on an assumption that if EPA did not alter the level for any of the pollutants, the date would be 2013. But if EPA changed the level for one of the pollutants, the compliance date for all the pollutants would move together. Petitioners' argument for a 2013 compliance date would be inconsistent with our prior decision.

In short, we reject petitioners' argument about the 2015 compliance date.

IV

We next consider petitioners' challenge to the affirmative defense that EPA created for cases of "unavoidable" malfunctions.

Section 304(a) of the Clean Air Act, 42 U.S.C. § 7604(a), allows individuals to file citizen suits in federal district court against sources that violate emission standards. Under the law as originally enacted, a court could order only injunctive relief as a remedy for a violation. But as part of the 1990 amendments to the Act, Congress expanded the citizen suit provision to give district courts authority to impose "any appropriate civil penalties," which may include monetary penalties. 42 U.S.C. § 7604(a).

In the 2010 Rule, EPA created an affirmative defense to Section 304(a) for certain emissions violations caused by "unavoidable" malfunctions. Under the affirmative defense, the district court may assess penalties only if violators "fail to meet [their] burden of proving all of the requirements in the affirmative defense." 78 Fed. Reg. at 10,039. EPA retained the affirmative defense when it promulgated the 2013 Rule. *See* 40 C.F.R. § 63.1344.

Petitioners now argue that the affirmative defense exceeds EPA's statutory authority and that it is for the courts to decide whether to create an affirmative defense in these private civil suits, not EPA. We agree.

The threshold question is whether petitioners have standing to challenge EPA's adoption of the affirmative defense. Petitioners are environmental associations with individual members across the country. EPA's affirmative defense would immunize certain emissions that petitioners contend should be penalized. Some of petitioners' members will suffer from those higher emissions, according to their affidavits. A ruling in their favor would prevent those emissions and help alleviate that harm. That's good enough. Petitioners have shown injury-in-fact, causation, and redressability, and they thus have standing under Article III.

We turn, then, to the substance of petitioners' challenge to the affirmative defense.

Section 304(a) grants "any person" the right to "commence a civil action" against any person "who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of" an emission standard or limitation under the Clean Air Act. 42 U.S.C. § 7604(a). The statute further provides that the federal district courts "shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation . . . and to apply any appropriate civil penalties." *Id.*

When determining whether civil penalties are appropriate, district courts look to Section 113(e)(1) of the Act, which directs courts to "take into consideration (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence . . . , payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation." 42 U.S.C. § 7413(e)(1).

Section 304(a) creates a private right of action, and as the Supreme Court has explained, "the Judiciary, not any executive agency, determines 'the scope' – *including the available remedies* – 'of judicial power vested by' statutes establishing private rights of action." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1871 n.3 (2013) (emphasis added) (quoting *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990)). Section 304(a) is in keeping with that principle. By its terms, Section 304(a) clearly vests authority over private

suits in the *courts*, not EPA. As the language of the statute makes clear, the courts determine, on a case-by-case basis, whether civil penalties are "appropriate." By contrast, EPA's ability to determine whether penalties should be assessed for Clean Air Act violations extends only to administrative penalties, not to civil penalties imposed by a court. *See* 42 U.S.C. § 7413(d)(2)(B) (Administrator may "compromise, modify, or remit, with or without conditions, any administrative penalty"). To the extent that the Clean Air Act contemplates a role for EPA in private civil suits, it is only as an intervenor. *See id.* § 7604(c)(2). EPA also of course could seek to participate as an amicus curiae.

EPA argues that its proposed affirmative defense simply fleshes out the statutory requirement that penalties be applied only when "appropriate." But under this statute, deciding whether penalties are "appropriate" in a given private civil suit is a job for the courts, not for EPA. When a private suit is filed, the defendant can argue that penalties should not be assessed, based on the factors in Section 113(e)(1) such as the defendant's "full compliance history and good faith efforts to comply." *Id.* § 7413(e)(1). EPA can support that argument as intervenor or amicus, to the extent such status is deemed appropriate by the relevant court. But under the statutory scheme, the decision whether to accept the defendant's argument is for the court in the first instance, not for EPA.

EPA alternatively contends that it is permitted to create the affirmative defense because of Section 301(a)(1) of the Clean Air Act. *See* 78 Fed. Reg. at 10,014. That provision authorizes EPA's Administrator to "prescribe such regulations as are necessary to carry out his functions under" the Act. 42 U.S.C. § 7601(a)(1). But we have consistently held that EPA's authority to issue ancillary regulations is not open-ended, particularly when there is statutory language on point.

*See, e.g.*, *American Petroleum Institute v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) ("the general grant of rulemaking power to EPA cannot trump specific portions of the CAA"); *NRDC v. Reilly*, 976 F.2d 36, 41 (D.C. Cir. 1992) (EPA cannot use its general rulemaking authority as justification for adding to a statutorily specified list); *Sierra Club v. EPA*, 719 F.2d 436, 453 (D.C. Cir. 1983) (same); *see also Gonzales v. Oregon*, 546 U.S. 243, 264-65 (2006) ("It would go . . . against the plain language of the text to treat a delegation for the 'execution' of [the Attorney General's] functions as a further delegation to define other functions well beyond the statute's specific grants of authority."). Those precedents establish a simple and sensible rule: EPA cannot rely on its gap-filling authority to supplement the Clean Air Act's provisions when Congress has not left the agency a gap to fill. So it is here.

On a different tack, EPA notes that Section 304(a)(1) does not expressly deny EPA the ability to create an affirmative defense, and EPA emphasizes that this Court has frequently recognized the need for flexibility in the administrative process. EPA Br. 46. That's true. But the suggestion implicit in EPA's argument – that we should "*presume* a delegation of power absent an express *withholding* of such power" – is "plainly out of keeping with *Chevron* . . . ." *Railway Labor Executives' Association v. National Mediation Board*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc).

Finally, EPA suggests that an affirmative defense for malfunctions is necessary to account for the tension between requirements that emissions limitations be "continuous" and the practical reality that control technology can fail unavoidably. *See* 78 Fed. Reg. at 10,014. That is a good argument for EPA to make to the courts – and for the courts

18

to then consider – in future civil cases when this issue arises. But it does not suffice to give EPA authority to create an affirmative defense.[2]

* * *

We grant the petitions for review with regard to EPA's affirmative defense and vacate those portions of the 2013 Rule pertaining to the defense. We deny the petitions in all other respects.

*So ordered.*

---

[2] The Fifth Circuit recently upheld EPA's partial approval of an affirmative defense provision in a State Implementation Plan. *See Luminant Generation Co. v. EPA*, 714 F.3d 841 (5th Cir. 2013). We do not here confront the question whether an affirmative defense may be appropriate in a State Implementation Plan.