# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 6, 2015        Decided July 29, 2016

No. 14-1145

WILDEARTH GUARDIANS, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL
DISTRICT AND SOUTH COAST AIR QUALITY MANAGEMENT
DISTRICT,
INTERVENORS

———

On Petition for Review of Final Agency Action of
the United States Environmental Protection Agency

———

*Paul Cort* argued the cause for petitioners. With him on
the briefs was *Colin C. O'Brien*.

*Brian H. Lynk*, Attorney, U.S. Department of Justice,
argued the cause for respondent. With him on the brief was
*John C. Cruden*, Assistant Attorney General. *Sam Hirsch*,
Attorney, entered an appearance.

*Barbara Baird*, *Lauren Nevitt*, *Annette A.
Ballatore-Williamson*, and *Jessica E. Hafer Fierro* were on

the brief for respondent-intervenors San Joaquin Valley Unified Air Pollution Control District and South Coast Air Quality Management District.

Before: SRINIVASAN, *Circuit Judge*, and WILLIAMS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

Under the Clean Air Act, the Environmental Protection Agency promulgates national ambient air quality standards. The Act sets out distinct statutory frameworks of varying levels of strictness for EPA to apply to air pollutants. This case involves the agency's regulation under the Act of a specific pollutant: fine particulate matter. For some time, EPA subjected fine particulate matter to a relaxed statutory framework under the Act. In 2013, however, this court instructed the agency that the framework it had been applying to fine particulate matter was incorrect and that a more onerous statutory framework governed that pollutant.

In response to our decision, EPA promulgated the implementation rule at issue here. During the time EPA had been applying the incorrect (and more relaxed) statutory framework to fine particulate matter, some of the stricter compliance deadlines that would have applied under the correct statutory framework had already elapsed. In its implementation rule, the agency made certain adjustments to those deadlines in an effort to avoid treating states as having already missed deadlines of which they were never aware.

WildEarth Guardians challenges EPA's authority to adjust the deadlines. In WildEarth's view, after this court issued its decision holding that EPA had been using the wrong framework, the agency was required to adopt a rule grounded

in an assumption that the correct framework had been applied all along, even though some of the deadlines under that framework would have already passed. We reject WildEarth's argument. We hold that, in the novel circumstances presented here, EPA reasonably acted within its statutory authority in adopting new deadlines aimed to avoid imposing retroactive burdens on states seeking to achieve compliance with governing air quality standards.

I.

A.

The Clean Air Act, 42 U.S.C. §§ 7401 *et seq*., requires EPA to publish a list of air pollutants that "may reasonably be anticipated to endanger public health or welfare." *Id*. § 7408(a)(1)(A). For each pollutant, EPA must promulgate national ambient air quality standards (NAAQS). *See id.* § 7409.

"Once EPA establishes NAAQS for a particular pollutant, the standards become the centerpiece of a complex statutory regime aimed at reducing the pollutant's atmospheric concentration." *Am. Trucking Ass'ns, Inc. v. EPA*, 283 F.3d 355, 358-59 (D.C. Cir. 2002). EPA designates areas of the country as "attainment," "nonattainment," or "unclassifiable," based on whether the region's atmospheric concentration of the pollutant falls below the level permitted by the NAAQS—in other words, whether the region has "attained" compliance with the standards. 42 U.S.C. § 7407(d)(1). Each state must then devise and submit to EPA a state implementation plan (SIP) that explains how any nonattainment areas will attain the standards. *Id*. § 7410(a)(1).

EPA first regulated particulate matter in the original set of NAAQS promulgated in 1971. *See* National Primary and Secondary Ambient Air Quality Standards, 36 Fed. Reg. 8186 (Apr. 30, 1971). Particulate matter refers to a mixture of liquid droplets and extremely small solids, which can be made up of various components including acids, chemicals, metals, soil, or dust. Particles can enter deep into the lungs and cause serious health problems. In 1987, EPA, recognizing that the size of particles directly affects the health risk, revised the particulate matter standard to include only "particles with an aerodynamic diameter less than or equal to a nominal 10 micrometers." Revisions to the NAAQS for Particulate Matter, 52 Fed. Reg. 24,634, 24,633-34 (July 1, 1987). Such particles are referred to as "$PM_{10}$."

## B.

In 1990, Congress enacted the Clean Air Act Amendments. *See* Pub. L. No. 101-549, 104 Stat. 2399. The Amendments revised the procedures for implementing NAAQS. The new Part D established five Subparts, each of which sets out a different framework of deadlines and requirements. Whereas Subparts 2 through 5 each pertain to a particular pollutant, Subpart 1 serves as a catch-all category, establishing the requirements for all remaining pollutants. Subpart 4 specifically governs particulate matter. *See* 42 U.S.C. §§ 7513-7513b. Because $PM_{10}$ was the only kind of particulate matter regulated by EPA at the time of the Amendments, Subpart 4 expressly referred to $PM_{10}$. *Id.*

Subpart 4's requirements are stricter than the default requirements set forth in Subpart 1. *Compare id.* §§ 7501-7509a (Subpart 1), *with id.* §§ 7513-7513b (Subpart 4). For instance, Subpart 1 gives EPA greater discretion to establish deadlines for states to submit SIPs following a nonattainment

designation, *see id.* § 7502(b), whereas Subpart 4 mandates specific deadlines under which SIPs are due within "18 months after the designation as nonattainment." *Id*. § 7513a(a)(2)(B).

Additionally, Subpart 1 does not require EPA to classify nonattainment areas based on the severity of their air control problem or the length of time for which an area has failed to achieve attainment. *See id.* § 7502(a)(1). By contrast, Subpart 4 establishes a rigorous set of classification procedures. Nonattainment areas are initially classified as "moderate areas." *See id*. § 7513(a). Such areas are expected to attain the requisite standards by "the end of the sixth calendar year after the area's designation as nonattainment." *Id.* § 7513(c)(1). Areas unable to achieve attainment by that deadline are reclassified as "serious areas" subject to heightened obligations. *Id*. § 7513(b).

Reclassification from moderate to serious can occur through one of two routes. Should an area fail to attain the requisite standard by the moderate-area attainment date, it is "reclassified by operation of law as a [s]erious [a]rea." *Id.* § 7513(b)(2)(A). Alternatively, an area can be reclassified as serious in advance of the moderate-area attainment deadline if EPA determines that the area cannot achieve attainment by that date. *Id*. § 7513(b)(1). That determination often arises out of an area's request to EPA for reclassification. *See, e.g.*, Intervenor Br. 7. Such voluntary reclassification must occur "within 18 months after the required date for the State's submission of a SIP for the [m]oderate [a]rea." 42 U.S.C. § 7513(b)(1)(B). Voluntary reclassification is advantageous because, if an area is reclassified as serious voluntarily rather than by operation of law, the state will have additional time (four years instead of eighteen months) to submit a SIP for that area. *See id.* § 7513a(b)(2).

Nonattainment areas can suspend further attainment planning obligations altogether (such as SIP submission) upon obtaining a "clean data determination" from EPA. An area qualifies for a clean data determination if it attains the NAAQS for three consecutive years. After securing a clean data determination, an area becomes eligible to seek redesignation as an attainment area. *See* Identification of Nonattainment Classification and Deadlines for Submission of SIP Provisions for the 1997 Fine Particle ($PM_{2.5}$) NAAQS and 2006 $PM_{2.5}$ NAAQS, 78 Fed. Reg. 69,806, 69,809-10 (proposed Nov. 21, 2013) (to be codified at 40 C.F.R. pt. 51).

## C.

In 1997, EPA revised the particulate matter standard. EPA acted in response to evidence that particles with an aerodynamic diameter less than or equal to 2.5 micrometers ($PM_{2.5}$) posed serious health risks even at levels permitted under the existing $PM_{10}$ regulations. *See* NAAQS for Particulate Matter, 62 Fed. Reg. 38,652, 38,665-68 (July 18, 1997). The agency thus established separate standards for two distinct types of particulate matter: fine ($PM_{2.5}$) and coarse ($PM_{10}$). *Id.* at 38,665. EPA set a stricter standard for fine particulate matter than for coarse particulate matter.

Since its initial adoption in 1997 of a separate standard for $PM_{2.5}$, EPA has revised that standard twice—in 2006 and again in 2012. *See* NAAQS for Particulate Matter, 71 Fed. Reg. 61,144 (Oct. 17, 2006); NAAQS for Particulate Matter, 78 Fed. Reg. 3086 (Jan. 15, 2013). This case implicates only the 1997 and 2006 standards. The 1997 standard took effect in 2005, when EPA published the initial air quality designations for most areas in the country. *See* Air Quality Designations and Classifications for the Fine Particles ($PM_{2.5}$) NAAQS, 70 Fed. Reg. 944 (Jan. 5, 2005). The 2006 standard

took effect in 2009 through an analogous rulemaking. *See* Air Quality Designations for the 2006 24-Hour Fine Particle (PM$_{2.5}$) NAAQS, 74 Fed. Reg. 58,688 (Nov. 13, 2009).

From 1997 onward, EPA implemented all of the PM$_{2.5}$ standards pursuant to the more relaxed provisions of Subpart 1, rather than the more prescriptive and onerous requirements of Subpart 4. *See* NAAQS for Particulate Matter, 62 Fed. Reg. at 38,695. The agency maintained that, under the plain terms of the statute, Subpart 4 referred specifically to PM$_{10}$. *See id.*

In *Natural Resources Defense Council v. EPA*, 706 F.3d 428 (D.C. Cir. 2013) (*NRDC*), we rejected EPA's approach of enforcing PM$_{2.5}$ standards under Subpart 1 rather than Subpart 4. By definition, we concluded, PM$_{2.5}$ *is* PM$_{10}$. *Id.* at 435. And under the statute, the agency was required to "implement all standards applicable to PM$_{10}$—including its PM$_{2.5}$ standards—pursuant to Subpart 4." *Id.* at 436. We therefore "remand[ed] to EPA to re-promulgate the[] [implementation] rules" for fine particulate matter under the correct framework. *Id.* at 437.

D.

In an effort to shift its implementation of PM$_{2.5}$ standards to Subpart 4 per our direction in *NRDC*, the agency promulgated the Implementation Rule at issue here. The Rule set forth new nonattainment designations and revised deadlines for states to submit SIPs for nonattainment areas. Identification of Nonattainment Classification and Deadlines for Submission of SIP Provisions for the 1997 Fine Particle (PM$_{2.5}$) NAAQS and 2006 PM$_{2.5}$ NAAQS, 79 Fed. Reg. 31,566 (June 2, 2014) (to be codified at 40 C.F.R. ch. I). In fashioning the Rule, EPA sought to account for the fact that,

had it applied Subpart 4 to $PM_{2.5}$ from the outset, some of the original Subpart 4 deadlines would have already passed by the time of the Rule (and of our decision in *NRDC*).

One set of those deadlines pertains to the submission of SIPs. For the 1997 standard, EPA issued nonattainment area designations in 2005, with an effective date of April 5 of that year. *See* Air Quality Designations and Classifications for the Fine Particles ($PM_{2.5}$) NAAQS, 70 Fed. Reg. at 944. Under the Subpart 1 framework applied to $PM_{2.5}$ at the time, EPA had discretion to establish the deadline for submission of SIPs for those areas. *See* 42 U.S.C. § 7502(b). But if Subpart 4 had been applied, states would have been statutorily required to submit SIPs within eighteen months of the nonattainment designation, *see id.* § 7513a(a)(2)(B), or by October 5, 2006. For the 2006 standard, correspondingly, the deadline for the submission of SIPs for nonattainment areas would have been June 14, 2011, because nonattainment designations under that standard became effective on December 14, 2009. *See* Air Quality Designations for the 2006 24-Hour Fine Particle ($PM_{2.5}$) NAAQS, 74 Fed. Reg. at 58,688. A failure to submit SIPs by the deadline results in a renewed requirement to submit plans and the possibility of penalties. *See* 42 U.S.C. § 7509.

Another set of affected deadlines pertains to reclassification of nonattainment areas. In particular, if the Subpart 4 framework had applied all along, moderate nonattainment areas for the 1997 standard would have already been reclassified as serious. That is because, under the April 5, 2005, effective date for EPA's nonattainment designations for the 1997 standard, the deadline for moderate areas to achieve attainment would have been December 31, 2011. *See id.* § 7513(c)(1). And if EPA did not find that an area achieved attainment within six months of that deadline, or by

June 30, 2012, Subpart 4 would have called for reclassification of the area to serious by operation of law as of that date. *See id.* § 7513(b)(2)(A). Affected states then would have been subject to the accelerated deadline for submission of SIPs for serious areas, under which the SIPs would have been due within eighteen months, or by December 31, 2013. *See id.* § 7513a(b)(2).

In its Implementation Rule, EPA declined to impose deadlines on states that rested on a counterfactual assumption that Subpart 4 had been applied to fine particulate matter from the outset. Such an approach, in EPA's view, would have carried unfair, retroactive implications for states that had been operating under the Subpart 1 framework (erroneously) applied by EPA.

EPA instead adopted an approach in which it made two adjustments to offset the fact that some Subpart 4 deadlines would have already passed had that framework been used all along. First, rather than find that states had already missed SIP submission deadlines for moderate areas, EPA established a deadline of December 31, 2014, for states to submit plans in accordance with Subpart 4. *See* Identification of Nonattainment Classification and Deadlines for Submission of SIP Provisions for the 1997 Fine Particle ($PM_{2.5}$) NAAQS and 2006 $PM_{2.5}$ NAAQS, 79 Fed. Reg. at 31,570. That revised deadline superseded all deadlines previously set under the Subpart 1 framework (as well as any deadlines that would have applied under the Subpart 4 framework). Second, rather than treat certain nonattainment areas as if they had already been reclassified as serious by operation of law, EPA classified all nonattainment areas under both the 1997 and 2006 standards as moderate. *See id.* at 31,567-70.

The areas primarily affected by the new Rule are those that were previously designated as nonattainment under the Subpart 1 regime and that had not yet submitted a SIP to the agency or received a clean data determination suspending attainment planning obligations altogether. Such areas, rather than being treated as having already missed the submission deadline for SIPs or as having been already reclassified as serious by operation of law, were classified as moderate areas and given until December 31, 2014, to submit SIPs. Three nonattainment areas fell into that category for the 1997 standard. Five areas did so for the 2006 standard.

## II.

WildEarth filed a petition for review in this court in which it challenges EPA's approach in the Implementation Rule as inconsistent with Subpart 4's statutory deadlines. Before addressing the merits of WildEarth's claim, we must resolve the threshold question of whether we have jurisdiction. This court generally has jurisdiction to review final actions taken by EPA under the Clean Air Act. *See* 42 U.S.C. § 7607(b)(1). EPA argues, however, that WildEarth lacks Article III standing to bring this challenge or, in the alternative, that intervening events have rendered the case moot. We disagree and conclude that WildEarth has standing to bring this petition for review and that the case is not moot with respect to WildEarth's challenge to the 2006 standard.

First, with regard to the question of standing, WildEarth, as the party filing suit, bears the burden of establishing its standing. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). To do so, WildEarth must demonstrate it has suffered an "injury in fact" that is "fairly traceable" to the defendant's action and that can likely be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

560-61 (1992) (quotations, internal alterations, and quotation marks omitted). The health and economic costs of increased $PM_{2.5}$ pollution for individuals in nonattainment areas constitute injuries in fact that are fairly traceable to the EPA's challenged rule, satisfying the first two standing requirements. The dispute here is primarily about the last prong, redressability.

EPA argues that a ruling in favor of WildEarth would not redress WildEarth's injury, because, while a favorable ruling would invalidate EPA's Implementation Rule, it would then have the effect of reinstating the preexisting (and more relaxed) Subpart 1 rules. That argument is unpersuasive. The necessary consequence of vacating the Implementation Rule on the ground that it failed adequately to adhere to Subpart 4 would be some kind of corrective EPA action strictly implementing that Subpart, e.g., immediate findings reclassifying nonattainment areas as serious (rather than moderate). And even if EPA were to fail to initiate that sort of remedial response, WildEarth could then file a mandamus petition to compel agency action. WildEarth's injury therefore could be redressed if it were to prevail in this challenge.

This brings us to the question of mootness. "[I]f an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the appeal must be dismissed." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quotation and internal quotation marks omitted). EPA asserts that intervening events have rendered this case moot. Although we agree with EPA as to the 1997 $PM_{2.5}$ standard, we conclude that WildEarth continues to have a legally cognizable interest in the outcome of the case with respect to the 2006 standard.

Understanding why the case is moot with regard to the 1997 standard, but not moot with regard to the 2006 standard, requires a highly technical review of the effect of WildEarth's prevailing in this case on the nonattainment areas affected by the Implementation Rule. For the 1997 standard, the Rule, as previously noted, affected three nonattainment areas. (All other areas that had been classified as nonattainment had already obtained a clean data determination by the time of the Rule's promulgation and accordingly had no ongoing planning obligations.) The three affected nonattainment areas were: Libby, Montana; Los Angeles-South Coast Air Basin, California; and San Joaquin Valley, California. *See* Identification of Nonattainment Classification and Deadlines for Submission of SIP Provisions for the 1997 Fine Particle (PM$_{2.5}$) NAAQS and 2006 PM$_{2.5}$ NAAQS, 78 Fed. Reg. at 69,809. Due to developments following the Rule's promulgation, the challenged aspects of the Rule no longer have any effect on those three areas.

San Joaquin Valley has since been reclassified as serious and has submitted its serious-area SIP. *See* Designation of Areas for Air Quality Planning Purposes, 80 Fed. Reg. 18,528 (Apr. 7, 2015) (to be codified at 40 C.F.R. pts. 52, 81). San Joaquin thus would be unaffected by a decision in WildEarth's favor—i.e., a decision vacating the Implementation Rule on the ground that EPA lacked authority to set a revised deadline for submission of SIPs of December 31, 2014. Because the extended timeline for submission of serious-area SIPs is the only consequential result of that revision, vacatur of the Rule's December 31, 2014, deadline would have no effect on an area (like San Joaquin) that has already submitted its plan. Even if EPA were to reject San Joaquin's plan, that rejection, regardless of the outcome in this case, would result in the imposition of a twelve-month period within which to submit plan revisions because of San

13

Joaquin's failure to achieve the 1997 standard by the serious-area attainment date of December 31, 2015. *See* 42 U.S.C. § 7513a(d). WildEarth's sole response is that EPA conceivably could do more than merely reject San Joaquin's plan, in that EPA might separately revoke the 1997 standard altogether and end any unmet planning obligations under that standard. That possibility is highly (and unduly) speculative, too much so to resuscitate an otherwise-moot controversy as to San Joaquin.

There is also no remaining practical effect for the other two affected areas—Libby and South Coast—under the 1997 NAAQS. Since the Rule's promulgation, Libby and South Coast have both received clean data determinations suspending all planning obligations under that standard. *See* Determinations of Attainment of the 1997 Annual Fine Particulate Matter Standard for the Libby, Montana Nonattainment Area, 80 Fed. Reg. 40,911 (July 14, 2015) (to be codified at 40 C.F.R. pt. 52); Clean Data Determination for 1997 $PM_{2.5}$ Standards; California-South Coast (signed July 8, 2016) (to be codified at 40 C.F.R. pt. 52). WildEarth responds that, if it were to prevail in this challenge, Libby and South Coast would be subject to the stricter requirements applicable to serious areas, and those additional restrictions would remain in effect notwithstanding a clean data determination. *See* 42 U.S.C. § 7513a(b). At this point, however, Libby and South Coast no longer face the possibility of reclassification as serious: it is clear from the clean data determinations for those areas that they, as of today, have attained the 1997 standard, precluding their reclassification as serious. For Libby and South Coast, then—as with San Joaquin—there is no continuing controversy as to the 1997 standard.

WildEarth's challenge is not moot, however, with regard to the 2006 standard. That standard took effect on December 14, 2009. *See* Air Quality Designations for the 2006 24-Hour Fine Particle (PM$_{2.5}$) NAAQS, 74 Fed. Reg. at 58,688. At the time, five areas were designated as nonattainment. Had the Act been implemented correctly from the outset, i.e., under Subpart 4, moderate-area SIPs for those areas would have been due on June 14, 2011. *See* 42 U.S.C. § 7513a(a)(2)(B).

WildEarth thus contends that, as relief, we should compel EPA to make an immediate finding under section 7410(k)(1)(B) that the states failed to submit their plans. *See* WildEarth Opening Br. 21. EPA claims the issue is now moot, because, under its approach in the Rule, such failure-to-submit findings have been ongoing in any event: the Rule called for states to submit moderate-area plans in compliance with Subpart 4 no later than December 31, 2014. Based on the statutory framework, EPA then had until June 30, 2015, to determine whether any state had failed to submit. *See* 42 U.S.C. § 7410(k)(1)(B). Were we now to compel EPA to make failure-to-submit findings based on the Rule's supposed departure from Subpart 4, the agency contends, it would merely delay the time of its failure-to-submit findings.

Even assuming that to be true, however, the schedule pursuant to which the failure-to-submit findings are conducted and imposed—i.e., the timeline under Subpart 4 versus the modified schedule under the Rule—would have a significant effect: it would determine whether areas can elect voluntary reclassification as serious. Under the statutory scheme, EPA can voluntarily reclassify an area only if (i) the moderate-area attainment deadline has yet to pass, and (ii) reclassification occurs within eighteen months of the deadline for submitting a SIP. *See id.* § 7513(b)(1). According to WildEarth, because moderate-area SIPs would have been due

by June 14, 2011, had Subpart 4 been applied all along, EPA's ability to grant voluntary reclassification expired eighteen months later, on December 14, 2012. The Rule, by contrast, set a new plan submission deadline of December 31, 2014, which had the effect of triggering a new window for voluntary reclassification. As a result, EPA was able to grant requests for voluntary reclassification until the December 31, 2015, moderate-area attainment deadline (which was unchanged by the Rule).

The opportunity to obtain voluntary reclassification in turn affects the deadline for a state's submission of a serious-area SIP: whereas voluntarily reclassified areas receive four years to submit a plan, areas reclassified by operation of law receive only eighteen months. *See id.* § 7513a(b)(2). If, as WildEarth suggests, areas can no longer obtain voluntary reclassification with respect to the 2006 standard, those areas would have to submit serious-area plans within eighteen months of their reclassification by operation of law—i.e., by December 31, 2017 (assuming, as WildEarth submits, reclassification occurred by operation of law within six months of the December 31, 2015, moderate-area attainment deadline). *See id.* § 7513(b)(2). By contrast, under EPA's approach, states with voluntarily-reclassified areas would have four years from the date of reclassification within which to submit serious-area plans—i.e., until December 31, 2019.

The difference between SIP submission deadlines of December 2017 and December 2019 would affect areas for which EPA has issued Proposed Rules granting voluntary reclassification as serious with regard to the 2006 standard. *See* Approval and Promulgation of Implementation Plans, 80 Fed. Reg. 1816 (proposed Jan. 13, 2015) (to be codified at 40 C.F.R. pts. 52, 81) (San Joaquin Valley); Approval and Promulgation of Implementation Plans, 80 Fed. Reg. 69172

(proposed Nov. 9, 2015) (to be codified at 40 C.F.R. pt. 52) (Logan, Utah/Franklin County, Idaho). Because of the Rule's impact on the serious-area SIP deadline for those areas, the case presents a live controversy as to the 2006 standard.

At oral argument, EPA counsel contended that the case nonetheless was moot even with respect to the 2006 standard. That contention was based on an EPA regulation promulgated long ago (and apparently since dormant) under which, according to counsel, the agency has leeway to disregard section 7513(b)(1)(B)'s requirement that voluntary reclassification be sought "within 18 months after the required date for the State's submission of a SIP for the Moderate Area." 42 U.S.C. § 7513(b)(1)(B); *see* State Implementation Plans for Serious PM-10 Nonattainment Areas, and Attainment Date Waivers for PM-10 Nonattainment Areas Generally, 59 Fed. Reg. 41,998 (Aug. 16, 1994). As a result of that regulation, EPA counsel contended at argument, voluntary reclassification of the affected three areas is permissible regardless of the outcome of WildEarth's challenge. We are unpersuaded.

Initially, it is unclear from the text of the regulation whether it necessarily even provides support for the interpretation suggested at oral argument. The regulation appears to reserve some discretion for EPA in allowing voluntary reclassification by clarifying that the statutory "directive does not restrict EPA's general authority"; but it otherwise affirms the statute's mandate that "[a]ppropriate areas are . . . reclassified as serious within 18 months after the required date for the State's submission of a moderate area PM-10 SIP." *Id.* at 41,999 & n.4. Moreover, we are unaware of any indication that the agency has previously invoked the authority purportedly established by the regulation to overcome the statute's eighteen-month timeframe, much less

of any judicial interpretation of that supposed authority. Lastly, the agency failed to note the regulation, even while arguing mootness, at any prior point in the proceedings. In these circumstances, the government has failed to carry its "heavy" burden to demonstrate mootness based on the regulation (or otherwise). *Cty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979) (quotation omitted).

III.

Having concluded that WildEarth has established its standing to challenge the Rule and that EPA has failed to demonstrate mootness with regard to the 2006 standard, we turn to the merits of WildEarth's challenge to EPA's implementation of that standard. (In light of our conclusion that WildEarth's challenge concerning the 1997 standard is moot, we have no occasion to consider WildEarth's argument that EPA lacked authority to classify all nonattainment areas under the 1997 standard as moderate.) With respect to the 2006 standard, WildEarth argues that the plan submission deadline established by the Implementation Rule is incompatible with Subpart 4. We conclude that, in the unique circumstances presented here, the Rule constitutes a reasonable exercise of EPA's rulemaking authority.

A.

The Act grants the EPA Administrator general authority "to prescribe such regulations as are necessary to carry out his functions under this chapter." 42 U.S.C. § 7601(a)(1). Of course, "EPA cannot rely on its gap-filling authority to supplement the Clean Air Act's provisions when Congress has not left the agency a gap to fill"—i.e., "when there is statutory language on point." *Nat. Res. Def. Council v. EPA*, 749 F.3d 1055, 1063-64 (D.C. Cir. 2014). Here, in response

to our remand in *NRDC*, s*ee* 706 F.3d at 437, EPA relied on its gap-filling authority to issue the Implementation Rule in an effort to bring its enforcement of the PM$_{2.5}$ standards into alignment with the Subpart 4 framework. In doing so, WildEarth argues, EPA exceeded its authority by overriding specific statutory requirements prescribed by Subpart 4.

WildEarth's argument is grounded in the understanding that, once EPA has established a particulate matter standard and identified nonattainment areas, Subpart 4 constrains the agency's discretion over implementation of the standard in certain ways. *See generally Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 484-85 (2001); *Nat. Res. Def. Council v. EPA*, 777 F.3d 456, 464 (D.C. Cir. 2014). For instance, classification of an area as moderate occurs "by operation of law"—without any further action by EPA—"at the time of [an area's] designation" as nonattainment. 42 U.S.C. § 7513(a). Moreover, the statute sets the moderate-area plan submission deadline, again without any action by EPA, as eighteen months after the date of nonattainment designation. *See* 42 U.S.C. § 7513a(a)(2)(B). And while a failure-to-submit finding by EPA is necessary to trigger sanctions for a state's failure to meet the plan submission deadline, *see id.* § 7509(a), the statute limits EPA's control over the timing of that finding, calling for the agency to make the finding "no later than 6 months after" the (statutorily mandated) submission deadline. *Id.* § 7410(k)(1)(B).

Under the language of those provisions, WildEarth argues, EPA was required to issue immediate, failure-to-submit findings for any state that had yet to submit a moderate-area plan for the 2006 standard. WildEarth reasons as follows: because Subpart 4 prescribes the date of moderate-area classification and the resulting deadlines for moderate-area plan submission and failure-to-submit findings,

and because all of those dates would have long lapsed had Subpart 4 been correctly applied to PM$_{2.5}$ from the outset, *see supra* p. 8, EPA was obligated to issue immediate, failure-to-submit findings to comply with the terms of Subpart 4. Instead of doing so, EPA adopted a Rule giving states the opportunity to submit moderate-area SIPs by a new deadline of December 31, 2014. That approach, WildEarth contends, is foreclosed by the statute.

We find that EPA acted within its authority under the statute. It is true that Subpart 4 sets the schedule for plan submission and failure-to-submit findings once the agency issues nonattainment designations, and that the agency generally lacks discretion to modify that schedule. But the statute does not address what should happen if, as in the novel circumstances of this case, all affected parties have been long acting on the mistaken assumption that a different framework—and hence a different schedule—controls. Of particular significance, the statute is silent about the appropriate course when, as here, issuing immediate, failure-to-submit findings (as WildEarth urges) in a purported effort to adhere to Subpart 4's plan submission schedule would have the effect of nullifying another feature of Subpart 4.

That is because, if EPA had found that states had already failed to submit moderate-area plans by the applicable deadline (WildEarth's approach) rather than establish a modified deadline for the submission of moderate-area plans (the Rule's approach), the agency would have eliminated a state's ability to request voluntary reclassification of a moderate area as serious. Ordinarily, states can receive voluntary reclassification within eighteen months of the plan submission deadline. *See* 42 U.S.C. § 7513(b)(1)(B). By pursuing that course, states gain an additional 2.5 years to submit a SIP for the area. *See id.* § 7513a(b)(2). Under

WildEarth's approach, however, the moderate-area plan submission deadline would have passed without states' awareness on June 14, 2011, such that states would have (unknowingly) lost the opportunity to seek voluntary reclassification within eighteen months of that (unknown) deadline. That result would effectively read out of the statute the voluntary-reclassification option afforded by Subpart 4, which presumably exists to encourage states to be proactive about meeting their obligations under the Act. EPA's approach in the Rule avoids that consequence.

In addition, the Rule thereby avoids a situation in which the agency's action would impose retroactive consequences on states, a result we have sought to avoid in our decisions. In *Sierra Club v. Whitman*, 285 F.3d 63 (D.C. Cir. 2002) (*Sierra Club I*), for instance, we ordered EPA to make a mandatory ozone NAAQS determination for the St. Louis area, which, under the statute, the agency should have done several years earlier. We refused, however, to order EPA to backdate its determination "to the date the statute envisioned, rather than the actual date of EPA's action." *Id*. at 68. We saw no basis for concluding that "Congress intended to give EPA the unusual ability to implement rules retroactively." *Id.* "Although EPA failed to make the nonattainment determination within the statutory time frame," we explained, "Sierra Club's proposed solution [would] only make[] the situation worse" because states "would face fines and suits" for not having timely implemented plans "even though they were not on notice at the time" of the various requirements and deadlines. *Id*.

Similar considerations animated our decision in *Sierra Club v. EPA*, 356 F.3d 296 (D.C. Cir. 2004) (*Sierra Club II*). In that case, EPA reclassified the District of Columbia from "serious" to "severe" nonattainment (a classification not at

issue here). The agency established a new deadline for the District's submission of a severe-area nonattainment plan because the original statutory deadline for such plans had long since passed. We rejected Sierra Club's argument that the original statutory deadline should govern, reasoning that such a result "would give the reclassification retroactive effect by holding the States in default of their submission obligations before the events necessary to trigger that obligation (reclassification) occurred." *Id.* at 309 (quotation and alteration omitted).

Those cases differ from this one in certain respects, as WildEarth emphasizes. The petitioners in *Sierra Club I* requested backdated findings, for instance, whereas WildEarth urges present findings of noncompliance. And in *Sierra Club II*, EPA had specific authority under Subpart 2 to "adjust any applicable deadlines (other than attainment dates) to the extent such adjustment is necessary or appropriate to assure consistency among the required submissions." 42 U.S.C. § 7511a(i). Subpart 4 includes no such specific authority to adjust deadlines.

At a more fundamental level, though, invalidating the Rule before us on the rationale that EPA should have immediately found that states had already missed the plan submission deadline would impose retroactive consequences of the kind that raised concerns in *Sierra Club I* and *Sierra Club II*. States would be held to long-passed deadlines of which they were unaware, with meaningful legal consequences. EPA emphasized those sorts of concerns in its rulemaking: "Because of the complexity of the [Act]'s SIP provisions and the interrelationship between federal and state action," EPA explained, "it is inappropriate to impose retroactive effect on decisions in a manner that would create deadlines that have long passed." Identification of

Nonattainment Classification and Deadlines for Submission of SIP Provisions for the 1997 Fine Particle (PM$_{2.5}$) NAAQS and 2006 PM$_{2.5}$ NAAQS, 79 Fed. Reg. at 31,568.

For those reasons, we reject WildEarth's argument that the Rule's establishment of a new plan submission date under the 2006 standard is foreclosed by Subpart 4. In the novel circumstances confronting EPA here, we conclude that EPA did not exceed its statutory authority under section 7601 in promulgating the Rule.

B.

We also find that the Rule was a reasonable exercise of EPA's gap-filling authority. In devising the new plan submission deadline, the agency took into account the "amount of time that ha[d] passed since the *NRDC* decision, when this rulemaking will be finalized, and the amount of time remaining before the 2006 PM$_{2.5}$ NAAQS attainment deadline under [S]ubpart 4 for most areas of December 31, 2015." *Id*. at 31,569. EPA sought to ensure that "all states with PM$_{2.5}$ nonattainment areas have a reasonable amount of time to develop any additional SIP elements that may be required under [S]ubpart 4 in response to the *NRDC* decision." *Id*. at 31,570.

Viewed in light of those understandable considerations, the Rule constitutes a reasonable effort to implement the Subpart 4 requirements in a timely fashion. Significantly, the agency retained the attainment deadline of December 31, 2015, for the 2006 standard, even though that date was fast approaching by the time of the Rule's promulgation in June 2014. Moderate areas thus received no additional time within which to achieve attainment with the 2006 NAAQS. Moreover, the agency's plan submission deadline of

December 31, 2014, was less than two years after the *NRDC* decision and some six months after the Rule. That short timeframe suggests a reasonable effort to expedite compliance with the Subpart 4 framework without imposing unfair obligations on states.

Additionally, in our decision in *NRDC*, we specifically declined NRDC's request to set a deadline for EPA to re-promulgate the rules governing $PM_{2.5}$ plans. *See NRDC*, 706 F.3d at 437 n.10. And rather than vacate the preexisting implementation rules, we chose to remand them, presumably in an effort to avoid "substantial disruption" and "at least temporarily preserve the environmental values covered by [the existing rules] until [they] could be replaced by a rule consistent with [the court's] opinion." *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 132, 134 (D.C. Cir. 2015) (quotation and internal quotation marks omitted). EPA's approach in the Rule is in keeping with those concerns. The Rule, in short, is a reasonable exercise of EPA's general rulemaking authority to bring its enforcement of $PM_{2.5}$ standards into alignment with the Subpart 4 framework.

\* \* \* \* \*

For the foregoing reasons, we dismiss the petition for review insofar as it concerns the 1997 standard, and we otherwise deny the petition.

*So ordered.*